In The

# United States Court of Appeals

For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## LAMBERT MBOM,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
————————————

BRIEF OF APPELLANT
————————————

Elizabeth A. Franklin-Best
Elizabeth Franklin-Best, P.C.
3710 Landmark Drive, Ste 113
Columbia, SC 29204
(803) 445-1333

*Counsel for Appellant*

# TABLE OF CONTENTS

Table of Authorities....................................................................................................iii

Jurisdictional Statement..............................................................................................1

Statement of Issues .....................................................................................................1

Statement of the Case .................................................................................................2

Statement of the Facts.................................................................................................3

Summary of the Argument………………………………………………………...15

Argument

I.     THERE WAS INSUFFICIENT EVIDENCE PRESENTED AT TRIAL TO SUSTAIN THE VERDICT, NECESSITATING REVERSAL.………………………………………………...…….15

II.    THE DISTRICT COURT ERRED IN DENYING MR. MBOM HIS PROPOSED JURY INSTRUCTION CONCERNING REASONABLE DOUBT SO AS TO DENY HIM HIS CONSTITUTIONAL RIGHT TO DUE PROCESS.
………………………………………………...…………………21

Conclusion .................................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Adalman v. Baker, Watts & Co.,* 807 F.2d 359 (4th Cir. 1986) ………………………..28
*Cage v. Louisiana*, 498 U.S. 39 (1990) ……………………………………………..23, 29
*California v. Roy*, 519 U.S. 2 (1996) ……………………………………………...30
*Dunbar v. United States*, 156 U.S. 185 (1894) ……………………………………24
*Duncan v. Louisiana*, 391 U.S. 145 (1968) ……………………………………………23
*Francis v. Franklin*, 471 U.S. 307 (1985) ……………………………………………24
*Harris v. Rivera*, 454 U.S. 339 (1981) ……………………………………………26
*In re Winship*, 397 U.S. 358 (1970) …………………………………………….22, 24-25
*Jackson v. Virginia*, 443 U.S. 307 (1979) …………………………………….16, 21-25
*Johnson v. Louisiana*, 406 U.S. 356, 360 (1972) ……………………………………25
*Leary v. United States,* 395 U.S. 6 (1969) ……………………………………………...30
*Sandstrom v. Montana*, 442 U.S. 510 (1979) ……………………………………………30
*Stromberg v. California*, 283 U.S. 359 (1931) ……………………………………………30
*Sullivan v. Louisiana*, 508 U.S. 275 (1993) …………………………………………....24, 29
*United States v. Burfoot*, 899 F.3d 326 (4th Cir. 2018) ……………………………...18
*United States v. Burgos,* 94 F.3d 849 (4th Cir. 1996) …………………………………16
*United States v. Chittenden*, 848 F.3d 188 (4th Cir. 2017) ……………………………18
*United States v. Davis*, 75 F.4th 428 (4th Cir. 2023) …………………………………16
*United States v. Edwards*, 188 F.3d 230 (4th Cir. 1999) ………………………………18
*United States v. High*, 117 F.3d 464 (11th Cir. 1997) …………………………………18
*United States v. Hornsby*, 666 F.3d 296 (4th Cir. 2012) ………………………………23
*United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989) …………………………………16
*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010) …………………………………23
*United States v. Lluesma*, 45 F.3d 408 (11th Cir. 1995) ………………………………18
*United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007) ……………………………...18
*United States v. Millender*, 970 F.3d 523 (4th Cir. 2020) ……………………………16
*United States v. Perry*, 335 F.3d 316 (4th Cir. 2003) …………………………………16
*United States v. Singh*, 54 F.3d 1182, 1189 (4th Cir. 1995) ……………………………21
*United States v. Sosa*, 777 F.3d 1279 (11th Cir. 2015) …………………………………18
*United States v. Walton*, 207 F.3d 694 (4th Cir. 2000) …………………………………23
*United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) …………………………16
*United States v. Williams*, 152 F.3d 294 (4th Cir. 1998) ………………………………23
*United States v. Wilson*, 133 F.3d 251 (4th Cir. 1997) …………………………………28
*United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007) …………………………………16
*Victor v. Nebraska*, 511 U.S. 1 (1994) ……………………………………………...25, 29

**Federal Statutes**

18 U.S.C. § 371……………………………………………...……………….1-3

18 U.S.C. § 1035………………………………………………...…………….17

18 U.S.C. § 1347………………………………………………...…………….17

18 U.S.C. § 1349…………………………………………………...………….1-2, 17

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. Appellant proceeded to trial and was found guilty of Count 1 – Conspiracy to commit Health Care Fraud and Wire Fraud in violation of 18 U.S.C. § 1349 and Count 2 – Conspiracy to Make false Statements Regarding Health Care Matters in violation of 18 U.S.C. § 371. *See* JA777. Mr. Mbom filed a timely Notice of Appeal February 14, 2024. JA783. Therefore, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

**I.** Whether there was sufficient evidence to sustain the conviction and sentence beyond a reasonable doubt.

**II.** Whether the district court erred in denying Mr. Mbom his proposed jury instruction concerning reasonable doubt so as to deny him his constitution right to due process.

## STATEMENT OF THE CASE

On April 1, 2021, Defendants Julius Bakari ("Bakari") and Mboutchock Kabiwa ("Kabiwa") were charged via criminal complaint with conspiracy to receive unlawful kickbacks, in violation of 18 U.S.C. § 371. (ECF Nos. 1, 4). Bakari and Kabiwa owned a mental health clinic in Washington, D.C. called Holy Healthcare Services, LLC ("Holy Health"). Kabiwa also ran a non-profit called the Agatha Foundation. Bakari was a Vice President of the Agatha Foundation. Subsequently, on January 7, 2022, Defendant Lambert Mbom ("Mbom") was charged via criminal complaint with (1) conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1343; and (2) conspiracy to pay unlawful kickbacks, in violation of 18 U.S.C. § 371. Mbom worked as a Program Administrator at Holy Health. JA785.

All three Defendants were subsequently indicted. On June 14, 2023, a grand jury returned a four-count Second Superseding Indictment. JA019. Count one charges all Defendants with conspiracy to commit healthcare fraud and wire fraud, in violation of 18 U.S.C. § 1349; Count two charged Bakari and Mbom with conspiracy to make false statements relating to healthcare matters, in violation of 18 U.S.C. § 371; Count three charged all Defendants with conspiracy to violate the Anti-Kickback Statute, in violation of 18 U.S.C. § 371; and Count four charged Bakari and Kabiwa with wire fraud, in violation of 18 U.S.C. § 1343. JA019.

Jury trial commenced on August 7, 2023. JA0817. At the close of the Government's case, Mr. Mbom made a Rule 29 Motion which was denied by the district

court. JA600. At the conclusion of the trial, on August 10, 2023, Mr. Mbom was found guilty of Count one – Conspiracy to commit Health Care Fraud and Wire Fraud in violation of 18 U.S.C. § 1349 and Count two – Conspiracy to Make false Statements Regarding Health Care Matters in violation of 18 U.S.C. § 371 and not guilty of Count three. JA769-770; JA777.

Mr. Mbom was formally sentenced on February 8, 2024 as follows: sixty (60) months as to count one and sixty (60) months as to count two to run concurrently to count one for a total term of sixty (60) months. JA1131; JA777. The Judgment in a Criminal Case was entered February 8, 2024. JA777. Mr. Mbom filed a timely Notice of Appeal February 14, 2024. JA783.

## STATEMENT OF FACTS

Ms. Gloria Mensah, was employed with the Department of Behavioral Health, as a provider relations specialist, whose primary goal was to act as a liaison between the agency and community-based organizations in the community. JA132. Holy Health Services was a provider she was assigned and the organization provided Mental Health Rehabilitation Services. JA134-135. Holy Health Services began as a certified partner agency in 2018 and was decertified in 2021. JA135-136. Ms. Mensah's primary contact with Holy Health Services was program director, Lambert Mbom. JA136. Ms. Mensah occasionally communicated with Holy Health Services CEO, Julius Bakari. JA137.

Department of Behavioral Health claims, such as those submitted by Holy Health Services are paid with a combination of local funds and Medicaid. JA140. Claims were

paid based upon the amount of time expended, in fifteen (15) minute increments. (p. 31).

Ms. Mensah testified Mr. Mbom never disclosed any concerns about Holy Health

Services' claims and/or billing practices to her agency. JA144-145. Ms. Mensah

admitted in her several years of experience however, she had never had anyone made

such a report during their employment, only after they left an agency. JA146-147.

Prior to the search of Holy Health Services by the FBI, Ms. Mensah was unaware

the organization was providing cash payments to consumers. JA138. Ms. Mensah

indicated it was against Department of Behavioral Health Regulations as well as illegal

to make cash payments to consumers. JA138.

Mr. Fru Nicholas Nde, was a former Community Support Worker (CSW) with

Holy Health Services, who began his employment in December of 2020. JA154. Mr.

Julius Bakari was his friend he had known for quite some time. JA196. As part of his

employment, he was instructed to input notes for patients. JA155. Mr. Nde testified he

received a "backdated" indicating the patients named were not there when he was hired

and he thus had not seen them, but was told by Mr. Julius Bakari and Mr. Mbom to put

notes in for the patients anyway. JA155-156. Mr. Nde did not see the patients on the list

he was given but was told by Mr. Julius Bakari and Mr. Mbom that a nurse had seen the

patients. JA156.

Mr. Nde relayed conversations he had with Mr. Mbom via WhatsApp where the

two discuss sending and inputting notes for patients. JA166. There were numerous

messages where Mr. Nde inquired of Mr. Mbom when he could come pick up the list of

patients he was to enter notes for. JA177-178. Mr. Nde relayed a specific inquiry he made to Mr. Mbom via WhatsApp where he inquired for his patient list he was to enter and Mr. Mbom replied "I am still to build your caseload." JA182. Mr. Nde recalled an occasion where he was given a list of more than eight patients for a specific day, so he questioned Mr. Mbom what other day he should put them as being seen on. JA185. On occasion, patients were noted as being seen by him on a date prior to his employment. JA187, 190).

Mr. Nde testified he input notes for patients he did not see despite the patient notes indicating he had personally seen the patients. JA166, 169. Mr. Nde testified he did so at the direction of Mr. Mbom. JA168. Although Mr. Nde did not personally see the patients, he was unaware if someone else did. JA173. During orientation on the system for which he entered notes, Mr. Nde testified Mr. Mbom told him to indicate each patient was seen for an hour. JA179. Mr. Nde detailed examples of what he input for patients, such as managing sleeping and anger issues. JA191. After he entered his notes into the system, Mr. Mbom would approve them. JA180. Mr. Nde estimated he wrote between 250-300 notes. JA181. At the time, he did not believe what he was doing was illegal. JA196.

Mr. Nde admitted to lying to the FBI in his July 2021 interview with law enforcement when he claimed he had seen numerous patients daily. JA168-169. Mr. Nde indicated he lied due to fear of getting in trouble. JA170.

Special Agent James Moran with the FBI was the lead case agent in charge of the

investigation of Holy Health Services. JA205. Agent Moran believed Mr. Mbom to be the program administrator of Holy Health Services. JA205. During his investigation, Agent Moran initiated confidential sources (Omar Murdoch, Darlene Williams, and Arif Ahmed) to act as patients and make undercover recordings. JA205-206, 210. These individuals received payment, consideration of pending criminal charges and/or a stay or deportation in exchange for cooperation. JA210. Ms. Williams made recordings for the FBI on approximately fifteen occasions, Mr. Murdoch eight occasions and Mr. Ahmed five occasions. JA212-213, 215.

An April 24, 2019 recording done by Mr. Murdoch he met with Community Service Worker Ms. Evelyn Chung the first time for about twelve (12) minutes and a second time for about four (4) minutes. JA221-223. After each visit to Holy Health Services, law enforcement collected $10 dollars he allegedly received after each visit. JA224. Agent Moran claimed he searched Mr. Murdoch before he entered Holy Health Services each time, making sure he never entered with any cash on his person. JA234.

A search of the system utilized by Holy Health Services showed an entry for April 24, 2019 for sixty (60) minutes of services and that service was billed to Medicaid. JA226-227, 232. Agent Moran reviewed the video footage of each undercover recorded visit to compare the time he was seen by a Holy Health Services representative to compare to the time submitted in the system as a Medicaid claim. JA228-229. Agent Moran testified a review showed the recorded visits did not match up with the billing as the billing grossly overstated the amount of time spent with Mr. Murdoch, which in

many cases where the few minutes spent was billed as a full hour. JA228.

A recording was also made for April 17, 2019 wherein Mr. Murdoch met with a Holy Health Services provider for about ten (10) minutes but the provider billed for an hour. JA233. Mr. Murdoch did not meet with a provider on May 8, 2019, but services were billed to Medicaid for a one-hour visit. JA233. This occurred on numerous occasions for a four-month period. JA228-229, 233.

An October 16, 2019 recording depicts Ms. Williams entering the Holy Heath Services building and meeting with a nurse for approximately twenty-four (24) minutes. JA238. The October 16, 2019 video depicts Ms. Williams receiving cash from Jeanne Foe, the individual behind the reception desk. JA239. Holy Health Services billed Medicaid for one hour for services rendered October 16, 2019. JA240. Another recording from October 22, 2019 with Ms. Williams depicts her meeting with a Community Services Worker (Dominic Forka) for approximately nine (9) minutes. JA244. Ms. Williams also turned over $10 dollars she received during her October 22, 2019 visit to law enforcement. JA245. There were occasions Ms. Williams went to Holy Health Services and did not receive any money. JA245. In totality, Ms. Williams received $90.00 from Holy Health Services after her visits. JA245. A review of records indicated Holy Health Services billed one hour for the October 22, 2019 visit with Ms. Williams. JA246. Agent Moran reviewed other recorded video visits made with Ms. Williams to the Medicaid entries submitted by Holy Health Services and found the billings grossly overstated the amount of time Ms. Williams spent with the provider. JA247. On March

18, 2021, 75 minutes of service was billed to Medicaid but Ms. Williams was not seen on that date. JA250-251.

Agent Moran testified to the chart for Mr. Ahmed which generally showed the time billed to Medicaid grossly exceeded the time he met with a provider. JA254. For example, on November 18, 2020, Mr. Ahmed met with a Holy Health Services provider for approximately fifteen (15) minutes, but sixty (60) minutes was billed to Medicaid. JA254-255. Similar billings were made February 26, 2021. JA255.

Special Agent Amanda Cdebaca with the FBI obtained and forensically extracted Mr. Mbom's cell phone. JA274. A review of the device indicated 373 phone messages were exchanged between Mr. Mbom and Francis Senesie and 435 WhatsApp messages were exchanged. JA276, 279. Of the WhatsApp messages, 354 had been deleted off Mr. Mbom's device, which Agent Cdebaca found unusual because because he did not delete messages with other contacts. JA279.

Mr. Francis Sensie pled guilty to Conspiracy to Commit Fraud, Medicaid for his role in organizing a scheme to commit Medicaid fraud. JA291. Mr. Sensie began employment with Holy Health Services in February of 2021 as a patient finder with Holy Health. JA293. Mr. Sensie believed he was doing good for the patients he brought in for mental health services. JA336. Mr. Sensie testified he eventually brought in the Community Support Workers who billed for services which never occurred. JA291. Mr. Sensie agreed as part of his plea to testify for the Government. JA292-293.

Mr. Sensie testified Mr. Mbom oversaw the day-to-day operations of Holy Health

Services as the chief administrator and his main contact throughout his employment. JA294, 311. As part of his employment, Mr. Sensie's job was go to into the community (i.e. homeless shelters, gas stations) where homeless individuals with potential mental health issues are known to hang out and talk to them about mental health services provided by Holy Health. JA295. Mr. Mbom paid Mr. Sensie $50.00 for each patient he located and then $30.00 per month if the patient stayed with the program. JA295. To become a patient, Mr. Sensie testified the individual had to have Medicaid. JA298. To convince individuals to come to Holy Health for services, sometimes Mr. Sensie would provide cash in the range of five-twenty dollars or provide food. JA298. If the individual agreed to proceed to Holy Health, Mr. Sensie would drive them in his car to the office. JA298.

Eventually, Mr. Sensie's role at Holy Health Changed from a patient locator to entering notes/billing on behalf of fake community service workers. JA301-302, 307-309. Mr. Mbom would allegedly create the logins for the fake community services workers and then Mr. Sensie would enter in the notes for the services purportedly rendered. JA303-309. The notes Mr. Sensie would enter were for services which never occurred. JA304. Mr. Sensie was paid via biweekly check for his work entering notes, at a rate of $35.00 per note. JA305.

On Fridays, Mr. Sensie claimed patients would line up in the lobby to receive cash payments handed out by Jane, who worked at the front desk. JA298-299. Mr. Sensie never saw Mr. Mbom issue money to any client. JA299. Mr. Sensie detailed the

payments he received from Holy Health for entering purported services into the system. JA330-334.

Mr. Donald Shearer is employed with the Department of Health Care Finance, a state Medicaid agency. JA354. Mr. Shearer is responsible for managing the provider enrollment process for Medicaid providers (i.e. Holy Health Services) as well as the system that is used to process claims on behalf of beneficiaries (i.e. patients). JA354-359. Mr. Shearer testified Medicaid does not permit payments to be paid to patients as "kickbacks." JA365. Mr. Shearer testified the agency "frowned up" paying individuals to recruit patients. JA367.

Mr. Dominic Forka previously worked at Holy Health Services as a Community Services Worker, ceasing his employment at the end of 2020. JA374. Mr. Forka was paid based on the amounts of notes he entered in the system. JA376. Mr. Forka claimed Mr. Mbom gave him a quote of 40 notes per week at one hour each. JA382. During his time with Holy Health Services, Mr. Forka entered in approximately 3,000 false notes and testified to examples of false entries he made concerning Ms. Williams. JA376, 386-390. The entries were approved by Mr. Mbom. JA390. Based upon the false notes written by Mr. Forka, Holy Health Services was paid approximately $365,000. JA376.

Mr. Forka believed the $10 dollars patients were provided was to pay their bus fare after their appointments. JA409. Mr. Forka believed he was helping patients when he met with them. JA410. Mr. Forka testified to WhatsApp messages he received from Mr. Mbom concerning the 40-hour minimum case note entry per week rule and his

requests for increased productivity. JA392-396. For his involvement, Mr. Forka pled guilty to fraud and agreed to testify on the Government's behalf. JA375-376.

Ms. Victoria Margolis was previously employed with Holy Health Services as a front desk manager (at the Martin Luther King location) beginning August 2019. JA423-425. Ms. Margolis was hired by Julius Bakari, the CEO of the business. JA425. Ms. Margolis testified Mr. Mbom's role at the company was providing technical support but he also had a managerial role. JA426-427. Ms. Margolis recalled being trained by Jane, the front desk worker of a different location, and noticed patients were paid $10 dollars but she did not know why. JA428. Later in her employment, she learned from Mr. Bakari that she was to give $5 dollars as a "travel stipend" to customers. JA429. Ms. Margolis did not believe however that the money was for travel, but to entice customers. JA430. Ms. Margolis detailed clients who were regularly paid the stipend each time they visited the office. JA441-442. Ms. Margolis was uncomfortable providing the payments, but did so because she was instructed to do so. JA442. When there was a shortage for paying the stipends, Ms. Margolis would contact Mr. Bakari or his wife. JA474. In November of 2020, Ms. Margolis and a therapist, Linda Morton, decided to stop paying clients the stipend to see if they still came in. JA443. Ms. Margolis testified to note entries submitted which she claimed to know were false but approved by Mr. Mbom. JA449-453.

In December of 2020, Ms. Margolis secretly recorded a meeting attended by Mr. and Mrs. Bakari, Mr. Mbom, and Jane (another front desk worker), and additional

support staff. JA453-454. During the meeting, Mr. Mbom discusses productivity and billing 400 notes per week. JA458-459. During the meeting, Ms. Margolis questioned Mr. Mbom about payments made to customers and brought up notes in the system which she believed were "not okay." JA459, 462. Mr. Mbom made no response to her questioning. JA463-464. Ms. Margolis brought up notes entered claiming to have met with a client she knew to be deceased and later learned the entry was edited to an "unsuccessful contact" entry. JA464-466. At the time of the recorded meeting, Ms. Margolis' office location had stopped paying clients the $5 dollar stipend. JA468. During the meeting, Mr. Mbom can be heard instructing Ms. Margolis to report other agencies who were paying customers to the Department of Behavioral Health. JA468.

During her employment, Ms. Margolis became a confidential source for law enforcement approximately January of 2021 in connection with their investigation of Holy Health. JA424. Ms. Margolis claimed to receive nothing in exchange for her work with law enforcement. JA425.

Ms. Margolis acknowledged she and Mr. Mbom had disagreements over the way the company should have been managed. JA472. Ms. Margolis acknowledged Mr. Mbom faced a great deal of pressure from Mr. Bakari to meet benchmarks. JA473.

Ms. Johanna Yee, a forensic accountant with the FBI, reviewed the financial and claim records of Holy Health Services along with the owners (Bakari) and various other subjects of investigation. JA478. Ms. Lee analyzed the Medicaid claims paid to Holy Health Services from January 1, 2017 to August 31, 2021. JA479. In 2019, just under 1.5

million was paid to Holy Health Services by Medicaid. JA479-480. During the entire period analyzed, Holy Health Services received $5,698,179 in payments from Medicare. JA482-483. In reviewing Holy Health Services bank account financials, Ms. Yee testified approximately 90% of the income obtained derived from Medicare payments. JA488.

A review of financials indicated Mr. Mbom was paid $245,321 during his time with Holy Health Services. JA489. Ms. Jeanne Foe received more payments from Holy Health Services than Mr. Mbom. JA489.

Ms. Jeanne Mboe-Foe was previously employed as a front desk reception with Holy Health Services (the North Capital location) between August 2014 and April 2021. JA509-512. Ms. Mboe-Foe gave cash to patients after each visit as instructed by Ms. Eugenie Bakari. JA512. Ms. Mboe-Foe believed the cash was used for transportation by the patients. JA511-512. Ms. Mboe-Foe recalled informing Mr. Mbom of her belief that they should stop the practice of giving cash to patients, but he said he needed to talk to Mr. Julius Bakari and Ms. Eugenie Bakari about it. JA514. Ms. Mboe-Foe testified Agatha Foundation, Ms. Bakari's non-profit organization, was the one supplying the funds for the payments to customers. JA517. Ms. Mboe-Foe was given the funds for the cash payments from Mr. or Mrs. Bakari and detailed the payments she received (via check or Zelle) for this purpose. JA517-522. A year or two prior to the business being raided by the FBI, Ms. Mboe-Foe conducted research about the legality of providing payments to customers and learned the practice was illegal. JA523. Ms. Mboe-Foe

claimed she told Mr. Mbom of what she learned and he responded that he needed to talk with Mr. Bakari. JA523-524. Ms. Mboe-Foe knew the practice of paying customers was illegal, but she continued to do so at the direction of Ms. Bakari. JA524. The practice of paying consumers cash at the conclusion of their visit was well established before Mr. Mbom began working for Holy Health Services. JA538.

Ms. Mboe-Foe recalled seeing Community Service Workers meet with patients while performing her duties with Holy Health Services. JA527-528. Ms. Mboe-Foe claimed patients complained they were not seeing the Community Service Workers long enough and so she brought it to the attention of Mr. Mbom. JA527-528. Mr. Mbom indicated he would address the issue with Mr. and Mrs. Bakari. JA528-529. For all things at the business that required change, Mr. Mbom always indicated he needed to consult Mr. and Mrs. Bakari. JA541. Ms. Mboe-Foe had a sense that Mr. Mbom was frustrated with the way Mr. and Mrs. Bakari were running Holy Health Services. JA541.

The Government recalled Special Agent Moran. JA552. Holy Health Services was raided by the FBI on April 2, 2021, but continued in operation until September 2021 when it was shut down by the Department of Behavioral Health. JA552.

Agent Moran testified to numerous fake Community Service Workers for whom Mr. Sensie and Mr. Forka among others, entered in notes as entries for patients (the confidential sources) which were never seen on the date indicated but billed as being seen, including individuals who were "seen" as reflected in the billing notes after they were deceased, which were approved by Mr. Mbom. JA553-559, 571-572, 583-588). Mr.

Forka had entered 1,402 notes which were approved by Mr. Mbom. JA581-582.

At the conclusion of Agent Moran's testimony, the Government rested. JA596. Mr. Mbom made a Rule 29 Motion, which was denied by the district court. JA600-605. Mr. Mbom did not present any evidence and the defense rested. JA630. Mr. Mbom renewed his Rule 29 Motion based upon the insufficiency of the evidence which was again denied by the district court. JA631-633.

## SUMMARY OF ARGUMENT

Because a review of the evidence adduced at trial, viewed in the light most favorable to the Government, failed to establish beyond a reasonable doubt that Mr. Mbom is guilty of counts one and two, he is entitled to reversal of his conviction and sentence. Furthermore, because the jury was not fully instructed as to "proof beyond a reasonable doubt" this Court should reverse his convictions to ensure his constitutional right to due process. This is especially true in a case such as this where the evidence against Mr. Mbom was far from overwhelming and the lacking elements of the jury instruction surely influenced the verdict.

## ARGUMENT

**I.     THERE WAS INSUFFICIENT EVIDENCE PRESENTED AT TRIAL TO SUSTAIN THE VERDICT, NECESSITATING REVERSAL.**

### A.     Standard of Review

Sufficiency of the evidence is reviewed to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020). *See also Jackson v.* Virginia, 443 U.S. 307, 17 (1979). In a sufficiency of evidence challenge, the court views evidence in the light "most favorable to the prosecution." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). Defendants carry a "heavy burden" to show that their convictions are not supported by substantial evidence. *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023).

A court will only affirm a jury's verdict "if there is substantial evidence" viewed favorably towards the Government to support the verdict. *United States v. Wilson*, 484 F.3d 267, 282 (4th Cir. 2007). "[S]ubstiantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

While the Government need not exclude every reasonable hypothesis of innocence, a verdict cannot stand on an uncertain foundation. *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989). This principle is especially important in cases involving inherently complex regulatory schemes. *See, e.g., United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) (reversing health care fraud and conspiracy convictions for insufficient evidence; "[n]either the regulations nor administrative authority clearly answer" the dispositive elemental question).

///

///

**B.    The evidence adduced at trial is insufficient to sustain the conviction and sentence.**

As a result of the jury's verdict, Mr. Mbom was convicted of Count 1 – Conspiracy to commit Health Care Fraud and Wire Fraud in violation of 18 U.S.C. § 1349 and Count 2 – Conspiracy to Make false Statements Regarding Health Care Matters in violation of 18 U.S.C. § 371.

A person is guilty of healthcare fraud if, "in connection with the delivery of or payment for health[care] benefits, items, or services," he knowingly and willfully executes a scheme "to defraud any health[care] benefit program" or "to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health[care] benefit program." 18 U.S.C. § 1347(a); *see also id.* § 1349 (prohibiting conspiracies to commit healthcare and wire fraud).

A person is guilty of making false statements regarding health care matters if the individual 1) knowing and willfully falsifies, conceals, covers up by any trick, scheme, or device a material fact or makes any materially false, fictitious, or fraudulent statements or representations, or 2) makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services. *See* 18 U.S.C. § 1035.

To sustain these convictions for conspiracy, this Court must conclude that

a reasonable fact-finder could determine that Mr. Mbom engaged in the following: 1) an agreement existed among two or more persons; 2) the defendant knew of the general purpose of the agreement; and 3) the defendant knowingly, willfully, and specifically participated in the agreement with the intent to do the illegal act charged. JA084. *See United States v. Burfoot*, 899 F.3d 326, 335 (4th Cir. 2018). *See also United States v. High*, 117 F.3d 464 (11th Cir. 1997). Mr. Mbom must have had the intent to do something the law forbids with the express intention to disregard the law. JA085. Put simply, Mr. Mbom's state of mind at the time he is alleged to have committed the crime charged is key to ascertaining whether he is guilty of the offenses. JA085. *See United States v. Edwards,* 188 F.3d 230, 234 (4th Cir. 1999); *United States v. Chittenden*, 848 F.3d 188, 195 (4th Cir. 2017) (vacated on other grounds).

Evidence that a defendant engaged in conduct that furthered the ends of the illegal conspiracy is not sufficient to prove his guilt unless the evidence further establishes beyond a reasonable doubt that the defendant knew about the unlawful ends that the conspirators envisioned. *United States v. Lluesma*, 45 F.3d 408 (11th Cir. 1995). In a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false. *United States v. Sosa*, 777 F.3d 1279 (11th Cir. 2015); *United States v. Medina*, 485 F.3d 1291 (11th Cir. 2007).

In this case, a review of the evidence in the light most favorable to the Government was insufficient to demonstrate Mr. Mbom engaged in a conspiracy to commit health care fraud or make false statements regarding health care matters. They key inquiry this Court must make is whether a reasonable jury could have found Mr. Mbom had the requisite intent at the time he committed the alleged offense and submits they could not. When considering the evidence adduced at trial, it became clear Mr. Mbom was trying to fix a troubled company so they could actually render services to people in need. For instance, employees testified they believed they were helping patients, JA336, 410, and Mr. Mbom was trying to keep productivity up so the business would keep running as he was aware the business had financial trouble. JA392-396, 498, 541. Was Mr. Mbom a poor manager, who alienated employees who did not agree with his ways, potentially yes. JA472. Did the evidence suggest Mr. Mbom blind to things he wished he would have seen at the time, yes. But that does not make him guilty of conspiracy to commit fraud in this case – no, it does not. What was missing from the presentation of the Government's case and not acknowledged by the jury is the fact that no evidence was presented to show Mr. Mbom participated in the conspiracy willingly with the intent to commit fraud. The Government did not present adequate evidence of his intent.

The evidence at trial established Mr. Mbom was in a role where he was not the direct individual in charge of Holy Health Services operation but more

so an employee who was trying to keep the business running and subject to the direction of the CEO, Mr. Bakari, and COO, Ms. Bakari. JA426-427, 473, 514 541. The evidence established Mr. Mbom encouraged productivity so the business could bounce back from its troubles and continue to service clients; not to commit fraud. JA473. While numerous records were presented at trial concerning the billed entries of Holy Health Services, none of these entries established Mr. Mbom's intent. Mr. Mbom has been placed in a predicament where he walked into a situation where practices were already long in place, including the giving of cash to patients which Mr. Mbom was not involved in. JA538, 299, 517. This includes the billing for services that had occurred in the past, but had not yet been billed. Given Mr. Mbom's desire to keep the business running and quotas met, it is likely he was simply trying to capture services that had been previously rendered into some form. As a whole, the Government presented no evidence which shed any light on what he understood his job to be, the directions he was given by supervisors, or anything which affirmatively established what he understood at the exact moment the purported fraud was perpetrated.

Because under no reasonable construction of the evidence could the jury have found Mr. Mbom guilty beyond a reasonable doubt of counts one and two, given the lack of evidence of his intent at the time he worked for Holy Heath Services, this Court must reverse. *See Jackson v. Virginia,* 443 U.S. at 307 (1979).

## II. THE DISTRICT COURT ERRED IN DENYING MR. MBOM HIS PROPOSED JURY INSTRUCTION CONCERNING REASONABLE DOUBT SO AS TO DENY HIM HIS CONSTITUTIONAL RIGHT TO DUE PROCESS.

### A. Standard of Review

This Court reviews a district court's determination of what instructions shall be given to the jury *de novo*. *See United States v. Singh*, 54 F.3d 1182, 1189 (4th Cir. 1995).

### B. Mr. Mbom was entitled to his proposed instruction concerning reasonable doubt.

Both pretrial and during the settling of instructions, Mr. Mbom requested the district court give his proposed jury instruction concerning reasonable doubt as to ensure his right to due process. (JA045, JA350, 629-630. The district court declined to give the proposed instruction. JA071. The instruction requested by Mr. Mbom is given in numerous jurisdictions and approved by various circuits throughout the United States. Specifically, Mr. Mbom requested the jury be instructed in one of two ways:

> **Option A)** The government must prove every element of the crime charged beyond a reasonable doubt. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt. Possible doubts or doubts based purely on speculation are not reasonable doubts. A reasonable doubt is a doubt based on reason and common sense. It may arise from the evidence, the lack of evidence, or the nature of the evidence.
>
> Proof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives. If you are convinced that the government has proved the defendant guilty beyond a reasonable doubt, say so by returning a guilty verdict. If you are not convinced, say so by returning a not guilty verdict. *Sixth Circuit Pattern Criminal Jury Instructions, Rule 1.03.*

**Option B**) Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty. *Ninth Circuit Manual of Model Criminal Jury Instructions (2022), Rule 6.5*.

Mr. Mbom requested one of the two proposed instructions because the Government's proposed instruction and the instruction ultimately given by the district court was not complete or constitutionally adequate. The addition of language cited from the Sixth or Ninth Circuit, had it been provided, would have ensured Mr. Mbom his right to due process.

While recognizing the central importance of "Proof Beyond a Reasonable Doubt" as the core value of due process in a criminal trial (*see In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)), the Supreme Court has held that the Constitution neither prohibits trial courts from defining reasonable doubt, nor requires them to do so. *Victor v. Nebraska*, 511 U.S.1 (1994). Unfortunately, the prior failure of the Supreme Court to create a consistent regime has allowed a conflict in the Circuits that places Defendants in markedly different positions with respect to their fundamental right to have the jury instructed upon

the meaning of Proof Beyond a Reasonable Doubt.

In this Circuit, "although the district court may define reasonable doubt to a jury . . . the district court is not required to do so. *United States v. Walton*, 207 F.3d 694, 696-97 (4th Cir. 2000) (en banc); *see also United States v. Williams*, 152 F.3d 294, 298 (4th Cir. 1998) ("The trial court is not required to define reasonable doubt as a matter of course so long as the jury is instructed that a defendant's guilt must be proven beyond a reasonable doubt."); *United States v. Lighty*, 616 F.3d 321, 380 (4th Cir. 2010) (internal quotation marks omitted.) This Circuit has explained, "Not requiring such an instruction is based on this Circuit's belief that attempting to explain the words beyond a reasonable doubt is more dangerous than leaving a jury to wrestle with only the words themselves." *United States v. Hornsby*, 666 F.3d 296, 310-311 (4th Cir. 2012). However, the failure to instruct on the issue leaves juries to guess what "Proof Beyond a Reasonable Doubt" may be. Is it a higher, or lower, standard than proof beyond a preponderance of the evidence? Does it require clear and convincing evidence, something more, or something less? If a jury cannot be relied upon to guess the elements of a crime in a constitutionally sustainable manner; how, exactly, is a jury in this Circuit to guess the meaning of the "Beyond a Reasonable Doubt" standard that, in the words of the Supreme Court, "plays a vital role in the American scheme of criminal procedure [because it] is a prime instrument for reducing the risk of convictions resting on factual error"? *Cage v. Louisiana*, 498 U.S. 39, 40-41, 111 S. Ct. 328 (1990) (per curium) (citations omitted); *See also Duncan v. Louisiana*, 391 U.S. 145, 151-154, 88 S. Ct. 1444 (1968); *Sullivan v. Louisiana*, 508 U.S. 275, 277-278,

113 S.Ct. 2078 (1993).

The Commentary to Rule 1.03 of the Sixth Circuit Pattern Criminal Jury Instructions (Updated as of 1 July 2019 and 21 March 2021) ["6th Cir. PCJI"] outlines the legal quagmire created by the Supreme Court:

> The reasonable doubt standard represents "a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, [397 U.S. 358], 397 U.S. at 372 (Harlan, J., concurring). *Accord, Francis v. Franklin*, 471 U.S. 307, 313 (1985). The purpose of the reasonable doubt standard is to reduce the risk of an erroneous conviction:

> > There is always in litigation a margin of error, representing error in factfinding [sic], which both parties must take into account. Where one party has at stake an interest of transcending value--as a criminal defendant his liberty--this margin of error is reduced as to him by the process of placing on the other party the burden of ... persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt.

> *In re Winship, supra* at 364.

> Despite repeated characterizations of the reasonable doubt standard as "vital," "indispensable," and "fundamental," *see Winship*, *supra* at 363-64 and *Jackson v. Virginia*, [443 U.S. 307] at 317, the Supreme Court has been ambivalent about whether and to what extent the term "reasonable doubt" should be defined. On the one hand, the Court has stated on three occasions that "attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." *Holland v. United States*, [348 U.S. 121] at 140; *Dunbar v. United States*, 156 U.S. 185, 199 (1894); *Miles v. United States*, 103 U.S. (13 Otto) 304, 312 (1880). On the other hand, the Court has said that "in many instances, especially where the case is at all complicated, some explanation or illustration of the rule may aid in its full and just comprehension." *Hopt v. Utah*, [120 U.S. 430] at 440. And in several other cases, the Court has quoted some rather lengthy explanations of the term without criticism. *See, e.g., Wilson v. United States*, 232 U.S. 563, 569-70 (1913); *Holt v.*

*United States*, 218 U.S. 245, 254 (1910); *Agnew v. United States*, [165 U.S. 36] at 51. *6th Cir. PCJI, Rule 1.03 Commentary.*

After further discussion, the commentary explains the Sixth Circuit's sifting of Supreme Court guidance to craft the Circuit's recommended pattern instructions:

> Supreme Court decisions provide a substantial amount of guidance on what instructions on reasonable doubt should say, some of it rather detailed. The Court has said that proof beyond a reasonable doubt does not mean proof to an "absolute certainty" or proof beyond all "possible" doubt. *Hopt v. Utah, supra*, 120 U.S. at 439-40. "[S]peculative minds may in almost every . . . case suggest possibilities of the truth being different from that established by the most convincing proof . . . [but] [t]he jurors are not to be led away by speculative notions as to such possibilities." *Id.* at 440.

> In dictum, the Supreme Court has described the state of mind the jurors must reach as "a subjective state of near certitude." *Jackson v. Virginia*, [443 U.S. 307] at 315. *Accord Johnson v. Louisiana*, 406 U.S. 356, 360 (1972); I*n re Winship, supra*, 397 U.S. at 364.

> The Supreme Court has approved the concept that a reasonable doubt is "one based on reason," *Jackson v. Virginia, supra*, 443 U.S. at 317, and has noted with apparent approval that numerous cases have defined a reasonable doubt as one "based on reason which arises from the evidence or lack of evidence." *Johnson v. Louisiana*, [406 U.S. 356] at 360. The Court has also approved the analogy that a reasonable doubt is one that would cause reasonable persons to "hesitate to act" in matters of importance in their personal lives. *Holland v. United States*, [348 U.S. 121] at 140, *citing Bishop v. United States*, 107 F.2d 297, 303 (D.C.Cir. 1939). *Accord Hopt v. Utah, supra,* 120 U.S. at 441.

> The Supreme Court has also disapproved or cast doubt on several concepts. In *Hopt v. Utah, supra* at 440, the Court said that "the words 'to a reasonable and moral certainty' add nothing to the words 'beyond a reasonable doubt' [and] may require explanation as much as the other." In *Victor v. Nebraska*, 511 U.S. 1 (1994), the Supreme Court held that use of the term moral certainty did not, of itself, make the reasonable doubt instruction unconstitutional. *Id.* at 14. This instruction does not use and never has used any moral certainty language. In *Cage v. Louisiana*, 498

U.S. 39 (1990), disapproved of on other grounds, *Estelle v. McGuire*, 502 U.S. 62, 73 n.4 (1991), the Court held that instructions defining a reasonable doubt as "an actual substantial doubt" and as one that would give rise to a "grave uncertainty" were reversibly erroneous. See also *Taylor v. Kentucky*, [436 U.S. 478] at 488, where the Court quoted the trial court's instruction defining a reasonable doubt as "a substantial doubt, a real doubt," and then said "[t]his definition, though perhaps not in itself reversible error, often has been criticized as confusing." In *Holland v. United States, supra*, 348 U.S. at 140 the Court said that the language "hesitate to act" should be used instead of the language "willing to act upon." In *Harris v. Rivera*, 454 U.S. 339, 347 (1981), the Court indicated that a reasonable doubt may exist even if the factfinder cannot articulate the reasons on which the doubt is based. *6thCir.PCJI, Rule 1.03 Commentary.*

Some Circuits have crafted jury instructions to provide guidance on the constitutionally essential concept of Proof Beyond a Reasonable Doubt. Though there are differences among the instructions, none of the following have been struck down by the Supreme Court.

In the Fifth Circuit, the jury is instructed as follows:

> The indictment or formal charge against a defendant is not evidence of guilt. Indeed, the defendant is presumed by the law to be innocent. The law does not require a defendant to prove his innocence or produce any evidence at all [and no inference whatever may be drawn from the election of a defendant not to testify].
>
> The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant. While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proved beyond all possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt.
>
> A "reasonable doubt" is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing

character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. *Fifth Circuit Pattern Jury Instructions (Criminal Cases), 2019 Edition, Instruction 1.05.*

In the Sixth Circuit, the jury is instructed:

. . . (4) The government must prove every element of the crime charged beyond a reasonable doubt. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt. Possible doubts or doubts based purely on speculation are not reasonable doubts. A reasonable doubt is a doubt based on reason and common sense. It may arise from the evidence, the lack of evidence, or the nature of the evidence.

(5) Proof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives. If you are convinced that the government has proved the defendant guilty beyond a reasonable doubt, say so by returning a guilty verdict. If you are not convinced, say so by returning a not guilty verdict. *Sixth Circuit Pattern Criminal Jury Instructions, Rule 1.03.*

In the Ninth Circuit, the jury is instructed that:

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty. It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation. It may arise from a careful and impartial consideration of all the evidence, or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant not guilty. On the other hand, if after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty, it is your duty to find the defendant guilty. Ninth Circuit Manual of Model Criminal Jury Instructions (2022), Rule 6.5.

The Eleventh Circuit instructs:

The Government's burden of proof is heavy, but it doesn't have to prove a Defendant's guilt beyond all possible doubt. The Government's proof only has to exclude any "reasonable doubt" concerning the Defendant's guilt.

A "reasonable doubt" is a real doubt, based on your reason and common sense after you've carefully and impartially considered all the evidence in the case.

"Proof beyond a reasonable doubt" is proof so convincing that you would be willing to rely and act on it without hesitation in the most important of your own affairs. If you are convinced that the Defendant has been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so. *Eleventh Circuit Pattern Jury Instructions for Criminal Cases (2022), Instruction B3.*

Each of the Circuits requiring an instruction on the meaning of "Proof Beyond a Reasonable Doubt" has sought to fulfill the proper role of the courts in a criminal case by determining the law and defining legal standards for the jury.

In other contexts, even this Circuit has recognized that **"it is the responsibility-- and the duty -- of the court to state to the jury the meaning and applicability of the appropriate law**, leaving to the jury the task of determining the facts which may or may not bring the challenged conduct within the scope of the court's instruction as to the law." *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 366 (4th Cir. 1986) (citations omitted, emphasis added); *United States v. Wilson*, 133 F.3d 251, 265-6 (4th Cir. 1997). **There are "no circumstances which would shift this burden from the court to the jury, where the jury judgment would be influenced, if not made, on the basis of …. the usual pattern of conflicting … opinions" of fellow jurors' view of the law**. *Id*. But when defining the meaning of "Proof Beyond a Reasonable Doubt," perhaps trying to avoid

reversal by a Supreme Court that has not provided specific guidance, this Circuit has evaded its requirement to state the meaning of the law.

Leaving a jury to determine the meaning of "proof beyond a reasonable doubt" abdicates the constitutional responsibility of the trial court and leaves the distinct possibility of an erroneous understanding of the standard. "It would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty.... the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Sullivan v. Louisiana*, 508 U.S. 275, 277-278 (1993). This is the very heart of the reason that, when a jury instruction incorrectly defines "beyond a reasonable doubt," "a defendant's Sixth Amendment right to jury trial is denied" and the verdict must be reversed. *Id*. A jury instruction that erroneously defines reasonable doubt is never harmless and must always invalidate the convictions. *Id.; Cage v. Louisiana*, 498 U.S. 39, 41; Cf. *Victor v. Nebraska, supra*, (in reviewing a state court's definition of reasonable doubt the Supreme Court's inquiry was limited to whether taken as a whole "there is a reasonable likelihood that the jury applied the reasonable doubt standard in an unconstitutional manner.")

The danger of leaving twelve jurors to their own uninformed perceptions of the meaning of "Beyond a Reasonable Doubt" without a definition from the court is that the jury is likely to employ an unconstitutional understanding of the term. By declining to instruct on the critical issue, the trial court is simply hiding the unconstitutional definition of reasonable doubt from the record and from appellate review.

The Jury is empowered to determine whether the Government's evidence was adequate to prove guilt "beyond a reasonable doubt": however, if a jury can choose between alternative theories of conviction on a specific count, the unconstitutionality of any of the theories requires that the conviction be set aside. *See, e. g., Stromberg v. California*, 283 U.S. 359 (1931); *Leary v. United States*, 395 U.S. 6, 31-32(1969); *Sandstrom v. Montana*, 442 U.S. 510, 526 (1979); *California v. Roy*, 519 U.S. 2, 6-8 (1996).

In the same way, the potential of an unconstitutional understanding of "beyond a reasonable doubt" applied by the jury in Mr. Mbom's trial likely resulted in an unconstitutional verdict. Here, the refusal of the trial court to provide the requested instruction on the meaning of proof "Beyond a Reasonable Doubt" left the potential for the uninstructed Jurors to apply an unconstitutional understanding of "Beyond a Reasonable Doubt." In a case such as this where the evidence against Mr. Mbom was far from overwhelming, as argued *supra* and confirmed by a not guilty verdict as to count three, this Court should reverse, finding the jury was inadequately instructed on reasonable doubt and find reversal necessary.

///

///

///

///

## CONCLUSION

Based on the foregoing, Mr. Mbom respectfully requests this Court reverse the

Judgment and remand for entry of a judgment of acquittal or in the alternative a new trial.


Respectfully submitted,

/s/ Elizabeth Franklin-Best
Elizabeth Franklin-Best, P.C.
3710 Landmark Drive, Suite 113
Columbia, South Carolina 29204
elizabeth@franklinbestlaw.com
(803) 445-1333

Dated this 5th day of July, 2024

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limit because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral arguments, signature block, certificates of counsel, addendum, attachments):

      [ X ] this brief contains <u>8,370</u> words, less than the 13,000 word maximum.

2.    This brief document compiles with the typeface and type style requirements because:

      [ X ] this brief contains has been prepared in a proportionally spaced typeface using *Microsoft Word* in *14pt Times New Roman*.


Dated this 5th day of July, 2024          /s/Elizabeth A. Franklin-Best
                                             *Counsel for Appellant*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 5th day of July, 2024, I caused this Brief of Appellant

and Joint Appendix to be filed electronically with the Clerk of Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF users:

Christopher Sarma
Megan McKoy

s/ Elizabeth A. Franklin-Best
*Counsel for Appellant*
